In re BARRY.

No. 43814.

District Court, E. D. New York.

Oct. 2, 1943.

See, also, 52 F.2d 496.

Friedman & Friedman, of New York City, for bankrupt.

Henry W. Parker, of New York City, for objecting creditor.

MOSCOWITZ, District Judge.

The bankrupt seeks to review the order of the referee denying his discharge in bankruptcy.

The referee sustained specifications of objections second and third which are as follows:

"Second: That the bankrupt has committed a crime punishable by imprisonment under the Bankruptcy Act [11 U.S.C.A. § 1 et seq.] by knowingly and fraudulently making a false oath in this his bankruptcy proceeding, in that in his oath to Schedule B in his schedules in bankruptcy on file herein, the bankrupt swore that said schedule was a statement of all his property; whereas in truth and in fact it was not a statement of all his property, in that he had omitted therefrom an interest in a retirement fund, and such omission was material to such proceeding, as such fund might become an asset of this bankrupt's estate."

"Third: That the bankrupt has failed at the adjourned first meeting of his creditors held herein on February 8, 1943, although requested to do so, satisfactorily to explain loss of assets or his deficiency of assets to meet his liabilities; such deficiency amounting to over $1500. and the assets not accounted for being the moneys borrowed from the creditors scheduled in his schedules in bankruptcy."

He dismissed the specification of objection number 1.

A considerable portion of the testimony relates to specification of objection number 1. The second specification of objection relates to the failure of the bankrupt to disclose his interest in a group insurance plan of the Federal Retirement System.

The bankrupt and his wife, Gertrude M. Barry, both filed voluntary petitions and were adjudicated bankrupts on the same day. In re Hugh J. Barry, No. 43814, and In re Gertrude M. Barry, D. C., 52 F. Supp. 496. The referee denied the discharge of Gertrude M. Barry for failure to disclose her interest in the New York City Teachers' Retirement System which under the New York State Education Law, Section 1109-o, is exempt and therefore not an asset of the bankrupt's estate. The court has filed an opinion in that case reversing the referee and granting her discharge.

The interest of the bankrupt Hugh J. Barry in the Federal Retirement System was not an asset of the bankrupt's estate. The interest of members in the Federal Retirement System is exempt from execution and an interest of a member cannot and does not become part of a member's estate in bankruptcy. Civil Service Retirement Act, 5 U.S.C.A. § 729, reads as follows:

"§ 729. Annuities not subject to assignment, execution, levy, or other legal process.

"None of the moneys mentioned in this or attachment, garnishment, or other legal process."

Even though the bankrupt's estate was not entitled to any funds belonging to the bankrupt in the Federal Retirement System, nevertheless the bankrupt was required to list such interest in such fund in his schedules in bankruptcy and in his statement of affairs, and if he knowingly and fraudulently failed to do so that would bar his discharge. However, the failure to list the same due to mistake, oversight or ignorance would not bar a discharge. See In re Taub, 2 Cir., 98 F.2d 81; Willoughby v. Jamison, 8 Cir., 103 F.2d 821; Sharcoff v. Schieffelin & Co., 2 Cir., 70 F.2d 725; In re Lovich, 2 Cir., 117 F.2d 612, 133 A.L.R. 673.

Nowhere in the memorandum filed by the referee does it appear that the failure to list the interest of the bankrupt in the Federal Retirement System was done knowingly or fraudulently. The referee merely states "the bankrupt is not to be the judge of whether or not the creditors have any claim against the fund." While that statement is correct, it does

494

not complete the picture. The question always remains whether the failure so to do was an honest one, or was it done knowingly or fraudulently. The testimony of the bankrupt was perfectly consistent with reference to this matter. He testified on discharge proceedings, as follows:

"Q. * * * at the time you executed your petition for bankruptcy and your schedules and statements did you think, at the time you executed them, of the existence of the City Retirement Fund? A. No, it didn't occur to me.

"Q. You did not think about it whatsoever at that time, did you? A. No, I didn't.

"Q. The non-placing of such a statement concerning such retirement fund in your petition was an oversight on your part?

"The Referee: He said he didn't think of it; he wouldn't purposely omit it.

"Q. If you had thought of it at the time would you have placed it in your schedules and your statement? A. Certainly."

At the first meeting of creditors he testified "it didn't occur to me to schedule anything I didn't have in my possession."

It is rather difficult to believe that the bankrupt, an employee in the Securities Exchange Commission, would knowingly and fraudulently fail to disclose his interest in the group insurance plan of the Federal Retirement System when anyone could obtain the information without the slightest difficulty. There is absolutely no evidence to sustain specification of objection number 2 and there is nothing in the memorandum of the referee in any wise indicating that the failure of the bankrupt to disclose his interest in the Federal Retirement System was done knowingly or fraudulently.

The third specification of objection is to the effect that the bankrupt failed at the adjourned first meeting of creditors, held on February 8, 1943, to satisfactorily explain loss of assets or his deficiency of assets to meet his liabilities in the sum of over $1,500.

■ This court is not unmindful of the fact that the referee's determination upon the facts should not be lightly disturbed and that his determination on the facts should not be set aside unless clearly erroneous and against the weight of evidence.

■ In the memorandum filed by the referee his sole discussion of specification of objection number three is, as follows:

"I have not overlooked the bankrupt's contention that his explanations at creditors' meetings and at the trustee's office were sufficient to comply with the Bankruptcy Act.

"This is fallacious reasoning and not in accordance with the law.

"The Referee is obligated to check any irregularities in the proceedings. If the schedules are incomplete the Referee must have the errors corrected. If a criminal offense against the Act is indicated he must report the matter to the United States Attorney.

"There can be no compliance with these duties if the bankrupt is examined in some attorney's office.

"The Circuit Court has held that a failure to explain the difference between assets and liabilities at the first or adjourned first meeting of creditors is a good objection to the discharge. Morris Plan v. Schorn, 2 Cir., 135 F.2d 538.

"On this score it is pertinent to note that the bankrupt can not start 'explaining' after his discharge is opposed. In re Gerber, 9th Cir., 186 F. 693.

"Upon the record the discharge of the bankrupt will be denied."

Nowhere in the memorandum does it appear that the referee has found that the bankrupt has failed to satisfactorily explain the loss of assets or his deficiency of assets to meet his liabilities in the sum of $1,500 or any other sum. It is true that the referee has made a finding of fact as follows: "The bankrupt failed satisfactorily to explain his deficiency of assets to meet his liabilities. The bankrupt did not or could not state to my satisfaction what disposition he had made of borrowed moneys which constituted his liabilities, and the third specification is sustained," but nowhere does it appear how he arrived at this conclusion on the facts.

The alleged discrepancy is $1,500. The bankrupt has a large family, six small children (one newly born). He testified that he spent this alleged difference of over $1,500 over a period of several years supporting himself and his family. He did not keep books, he was not required to do so. He had to rely upon his memory. Taking care of a family of that size is no small task and the purchase of clothing,

medicine, food and supplies, etc., over a period of several years could easily make up this difference, if difference there was.

The referee has not decided that there is anything improbable in the bankrupt's testimony or that he did not believe the statements that he made. There should have been some discussion of the facts by the referee.

There is not the slightest evidence to sustain the finding that the bankrupt failed at the adjourned first meeting of his creditors, held on February 8, 1943, or at any other time to satisfactorily explain loss of assets or his deficiency of assets to meet his liabilities. The fact that the bankrupt had liabilities of $1,567.82 and no assets did not justify the conclusion reached by the referee. The total income of the bankrupt from the Securities Exchange Commission and his wife who taught occasionally was $15,515.91 for a period of three years. Evidently, the referee denied the discharge because the bankrupt had liabilities of some $1,500. The bankrupt's explanation was very clear as it appears by the following questions and answers:

"Q. If you spend almost approximately what you earned how does it happen you owe $1500? A. Because previous to the three years there was maybe $1300 owed. I don't make any allowances here for incidentals spent but things that I could think of readily—newspapers, cigars, anything like that. I am not trying to prove penny for penny.

"Q. We are not talking about pennies but $1500. A. Yes, there was thirteen or fourteen hundred dollars about three years ago so that amount is still outstanding plus a couple of hundred dollars more.

"Q. To whom was it due? A. To the various banks.

"Q. What had you done with the money which you borrowed from the various banks? A. Used it in previous years.

"Q. Does that show up on that schedule that you have there? A. When and what I used it for the previous three years? No, because this is only an estimate of the last three years and not three years previous to that.

"Q. Well now which is correct, Mr. Barry? You were asked on February 8th what did you use the money for which you borrowed? A. I would say current living expenses and that is right.

"Q. Is that right, current living expenses? A. That is right.

"Q. Now, according to your figures there, your living expenses and your earnings were approximately the same; is that right? A. I think you are ignoring the fact that I just said this is supposed to represent the money for the last three years and the money which I borrowed and spent was not spent for the last three years but spent three years previous thereto.

"Q. Correct me, if I am wrong, Mr. Barry but, as I understand it, your first loan from the Morris Plan was in April of 1940 and, I also understand your first loan from the National City Bank was in April of 1940. That is about $1,000. A. That was $1300 I owed at that time, previous to three years ago I owed that money.

"Q. To who? A. To the banks you just mentioned.

"Q. To what banks? A. You mentioned Morris Plan and National City.

"Q. I just asked you whether or not your first loans there were made in April of 1940? A. That is right, but that was a refinance of some other loan anyway, in all probability.

"Q. Well — A. In other words during the last three years I just received my salary plus maybe two or three hundred dollars more as a result of loans. The money that was outstanding over the two or three hundred dollars was outstanding previous to three years ago.

"Q. What did you do with the money which you borrowed from the National City Bank in April of 1940? A. That had been spent previous to 1940.

"Q. Before you borrowed it? A. Usually. When I took out the loan it was to repay something that had been purchased previous thereto from stores and other places. In other words the moneys I took out in April of 1940 was not spent after that but I was already liable for that money previous to that.

"Q. To whom? A. The stores or to whoever it was I owed at the time.

"Q. Do you know what stores? A. No.

"Q. Did you have any record that would show that? A. No.

"By Mr. Friedman:

"Q. Mr. Barry, what is the size of your family? A. At the present time it is six children, my wife and myself.

"Q. At times have you had any relatives living with you? A. No, sir.

"Q. But have you helped support any relatives? A. Yes, I would say that the money that I gave them was used for their care.

"Q. Would you say that the money that you are unable to repay to those people whom you have listed in your schedules in bankruptcy is because you have been living beyond your income and beyond your wife's income to support your family? A. That is probably a true statement.

"Q. Where did these moneys that you borrowed and the moneys that you earned go to? A. Living expenses, the care of the family.

"Q. And were your living expenses for the period of the last five years greater than your income? A. Yes, sir.

"Q. Would you estimate how much per year your living expenses, over the last five years were greater than your income? A. I would say about $300 per year.

"By Mr. Parker:

"Q. So when you made these various loans you didn't have any reasonable expectancy of paying them back? A. Yes, I did.

*       *       *       *       *

"At the time I took out the loans there was every indication and expectancy that my earnings and salary would be increased and my wife also, in her position as school teacher also received an annual income which, during the period of years would be substantial and I expected as the years went on that we would be able to make both ends meet and at the same time pay off all the loans, and then when my wife had another child she had to stop working and she was unable to have her income.

"Q. And all of these loans were to be paid off within a period of not over fifteen months, weren't they? A. Not necessarily; the bank granted that formally but always with the reservations and practice of refinancing them whenever necessary."

A bankrupt should be required to satisfactorily explain any loss of assets or any deficiency of assets to meet his liabilities and his failure so to do should deny him his discharge.

In this instance the bankrupt has more than met that requirement. He is entitled to his discharge.

Settle order on notice.